IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

RENEE L. GOIN-SPRAGUE,                                    Case No. 6:14-cv-00897-CL

          Plaintiff,                                            OPINION AND ORDER

    v.

CAROLYN W. COLVIN,
Commissioner, Social Security
Administration,

                Defendant.

Kathryn Tassinari
Robert A. Baron
Harder, Wells, Baron & Manning, P.C.
474 Willamette, Suite 200
Eugene, Oregon 97401
      Attorneys for plaintiff

Billy J. Williams
Janice Herbert
United States Attorney's Office
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97201

Jordan D. Goddard
Social Security Administration
701 Fifth Avenue, Suite 2900 M/S 221A
Seattle, Washington 98104
      Attorneys for defendant

Page 1 – OPINION AND ORDER

CLARKE, Magistrate Judge:

Plaintiff Renee Goin-Sprague brings this action for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her applications for Title XVI Social Security Income ("SSI") and Title II Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"). All parties have consented to allow a Magistrate Judge enter final orders and judgment in this case in accordance with Fed. R. Civ. P. 73 and 28 U.S.C. § 636(c). For the reasons set forth below, the Commissioner's decision is affirmed and this case is dismissed.

## PROCEDURAL BACKGROUND

On October 26, 2010, plaintiff applied for SSI and DIB. Tr. 11, 142-55. Her applications were denied initially and upon reconsideration. Tr. 11, 84-89, 94-97. On March 5, 2013, a hearing was held before an Administrative Law Judge ("ALJ"), wherein plaintiff was represented by counsel and testified, as did a medical expert ("ME"). Tr. 32-64. On April 2, 2013, the ALJ issued a decision finding plaintiff not disabled within the meaning of the Act. Tr. 11-26. After the Appeals Council denied her request for review, plaintiff filed a complaint in this Court. Tr. 1-5.

## STATEMENT OF FACTS

Born on February 7, 1962, plaintiff was 44 years old on the alleged onset date of disability and 51 years old at the time of the hearing. Tr. 24, 44, 142, 149. Plaintiff left high school during the ninth grade but later obtained her GED. Tr. 24, 44, 182. She worked previously as a waitress, veneer dryer, bartender, and cook. Tr. 24, 182. Plaintiff alleges disability as of

December 31, 2006, due to tendonitis, collapsed arches, leg and back pain, high cholesterol, and fibromyalgia.[1] Tr. 142, 149, 166, 181, 193-94.

## STANDARD OF REVIEW

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. *Hammock v. Bowen*, 879 F.2d 498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citation and internal quotations omitted). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). Variable interpretations of the evidence are insignificant if the Commissioner's interpretation is rational. *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1502, 416.920. First, the Commissioner determines whether a claimant is engaged in "substantial

---

[1] Plaintiff previously applied for DIB and SSI; her claims were denied after a hearing on November 14, 2008. Tr. 11, 167. Accordingly, the relevant adjudication period began on November 15, 2008, as opposed to plaintiff's alleged onset date, due to res judicata. Tr. 11.

Page 3 - OPINION AND ORDER

gainful activity." *Yuckert*, 482 U.S. at 140; 20 C.F.R. §§ 404.1520(b), 416.920(b). If so, the claimant is not disabled.

At step two, the Commissioner evaluates whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment, she is not disabled.

At step three, the Commissioner determines whether the claimant's impairments, either singly or in combination, meet or equal "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(d), 416.920(d). If so, the claimant is presumptively disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner resolves whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(f), 416.920(f). If the claimant can work, she is not disabled; if she cannot perform past relevant work, the burden shifts to the Commissioner. At step five, the Commissioner must establish that the claimant can perform other work existing in significant numbers in the national or local economy. *Yuckert*, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(g), 416.920(g). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. §§ 404.1566, 416.966.

## THE ALJ'S FINDINGS

At step one of the five step sequential evaluation process outlined above, the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date. Tr. 14. At step two, the ALJ determined that plaintiff had the following severe impairments: "tendonitis; collapsed arches; back and leg problems; possible fibromyalgia; and asthma." *Id.* At step three,

the ALJ found plaintiff's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. Tr. 18.

Because she did not establish presumptive disability at step three, the ALJ continued to evaluate how plaintiff's impairments affected her ability to work. The ALJ resolved that plaintiff had the residual functional capacity ("RFC") to perform "light work as defined in 20 CFR 404.1567(b) and 416.967(b)" except she:

> is limited to occasional postural activities with the exception of no climbing of ladders, ropes or scaffolds; occasional walking on uneven surfaces; should avoid concentrated exposure to pulmonary irritants, excessive humidity, excessive wetness, extreme cold, extreme heat and excessive vibration; and should avoid concentrated exposure to excessive noise.

Tr. 19.

At step four, the ALJ determined plaintiff could not perform any past relevant work. Tr. 24. At step five, the ALJ concluded that the Medical-Vocational Guidelines ("Grids") directed a finding of non-disability. Tr. 25.

## DISCUSSION

Plaintiff argues that the ALJ erred by: (1) neglecting to include her fibromyalgia, bilateral ulnar mononeuropathies, depression, and panic disorder as medically determinable, severe impairments at step two; (2) improperly assessing the medical opinions of Allison Keiter, Psy.D., and Alexander White, M.D.; and (3) employing the Grids at step five in light of her non-exertional limitations.

I.    Step Two Finding

Plaintiff contends that the ALJ erred at step two by neglecting to list her fibromyalgia, bilateral ulnar mononeuropathies, depression, and panic disorder as medically determinable,

severe impairments. At step two, the ALJ determines whether the claimant has an impairment, or combination of impairments, that is both medically determinable and severe. 20 C.F.R. §§ 404.1520(c), 416.920(c). An impairment is severe if it "significantly limits [the claimant's] ability to do basic work activities." *Id.* An impairment is medically determinable if it is diagnosed by an acceptable medical source and based upon acceptable medical evidence, such as "signs, symptoms, and laboratory findings"; "under no circumstances may the existence of an impairment be established on the basis of symptoms alone." SSR 96–4p, *available at* 1996 WL 374187; 20 C.F.R. §§ 404.1513(a), 416.913(a).

The Court notes, at the outset, that the ALJ resolved step two in plaintiff's favor and, as addressed in greater detail below, considered the allegedly wrongfully omitted impairments in formulating the RFC. Tr. 14-18, 19-24. As such, any error in failing to designate a specific impairment as severe at step two was harmless. *See Jensen v. Astrue*, 2012 WL 4470507, *2-3 (D.Or. Sept. 25, 2012) (ALJ did not err at step two in determining that the claimant's post-traumatic stress disorder and anxiety were non-severe because he identified other medically determinable severe physical and mental impairments) (citations omitted); *see also Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (step two is a "de minimus screening device to dispose of groundless claims").

A.    Fibromyalgia

Fibromyalgia qualifies as a medically determinable impairment "if the physician diagnosed [fibromyalgia] and provides the evidence [described] in section II(A) or section II(B), [which are] generally base[d] on the 1990 American College of Rheumatology (ACR) Criteria." SSR 12–29, *available at* 2012 WL 3104869. Sections II(A)and II(B) both mandate, in relevant part, "[a] history of widespread pain [that has lasted for a minimum] of 3 months [and] [e]vidence that other disorders that could cause the symptoms or signs were excluded." *Id.* In

Page 6 - OPINION & ORDER

addition, section II(A) requires, in terms of signs and symptoms, "[a]t least 11 positive tender points on physical examination[,]" whereas section II(B) necessitates "[r]epeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions." *Id.*

As a preliminary matter, the ALJ included "possible fibromyalgia" as a medically-determinable, severe impairment at step two and plaintiff does not provide any meaningful argument regarding how this finding is insufficient. *See McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2011) (as amended) (the claimant bears the burden of establishing how an alleged error is harmful). Regardless, although the record before the Court contains multiple references to fibromyalgia, no medical source, acceptable or otherwise, performed testing consistent with SSR 12–29 or the ACR criteria. Rather, all of the evidence relating to this impairment reflects plaintiff's self-reports. *See, e.g.*, Tr. 270-72, 312-13, 384. Dr. White, the ME who reviewed the entire medical record and was the only source to directly opine as to this condition, explained that plaintiff's fibromyalgia diagnosis was premised on the fact that her "physical findings . . . were all negative" and "she has joint and muscle symptoms." Tr. 35. In other words, as Dr. White acknowledged, there is no fibromyalgia diagnosis in the record accompanied by reference to any clinical findings or examinations. The ALJ did not err in including "possible fibromyalgia" as a medically determinable, severe impairment at step two.

      B.    Bilateral Ulnar Mononeuropathies

In February 2011, plaintiff underwent an electromyography, which revealed "moderate" bilateral compressive ulnar mononeuropathies at both elbows. Tr. 316. During the hearing, although Dr. White interpreted these test results as reflecting "some" impairment, he ultimately concluded that plaintiff's bilateral ulnar mononeuropathies were "no[t] severe." Tr. 38. Accordingly, Dr. White did not identify any elbow-, arm-, or wrist-related limitations. Tr. 35-38. In evaluating step two, the ALJ discussed plaintiff's diagnosis of bilateral ulnar

mononeuropathies but did not find that this condition significantly limited plaintiff's ability to do basic work activities.[2] Tr. 14-16, 20-21.

On appeal, plaintiff has not pointed to any credible evidence establishing that she is more functionally limited by this condition than determined by Dr. White or, by extension, the ALJ.[3] *McLeod*, 640 F.3d at 888; *see also Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (as amended), *cert. denied*, 519 U.S. 1113 (1997) (ALJ properly determined that the claimant's "mild" impairments were "nonsevere"). Further, as the ALJ repeatedly noted, "no treating or examining physician has ever identified any significant functional loss with respect to [plaintiff's] pain complaints," including the doctor that performed the electromyography. Tr. 20, 314-16. The ALJ did not err in neglecting to list plaintiff's bilateral compressive ulnar mononeuropathies as a severe impairment at step two.

### C.   Depression and Panic Disorder

In February 2011, Dr. Keiter performed a one-time examination to assess plaintiff's mental functioning. Tr. 247-51. Dr. Keiter's opinion was based on plaintiff's subjective symptom statements and her independent findings. *Id.* Dr. Keiter noted that, outside of attending one

---

[2] Although the ALJ's finding regarding this precise issue was not explicit, it can be reasonably inferred from the ALJ's decision. *See Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) ("[a]s a reviewing court, we are not deprived of our faculties for drawing specific and legitimate inferences from the ALJ's opinion").

[3] Plaintiff bases her argument on her subjective symptom statements and Dr. White's hearing testimony regarding work involving "extensive use of the hands, elbows or arms." Pl.'s Opening Br. 17; Pl.'s Reply Br. 6-7. Yet the ALJ found plaintiff not fully credible and she does not challenge that finding on appeal. Moreover, plaintiff has not identified a single job in the light exertion occupational base that entails extensive use of the hands, elbows, or arms. As a result, even assuming the ALJ erred in failing to include this impairment as severe at step two, the Court has no basis to conclude that the ALJ's ultimate finding of non-disability was erroneous. *See Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055 (9th Cir. 2006) (mistakes that are "nonprejudicial to the claimant or irrelevant to the ALJ's ultimate disability conclusion" are harmless).

counseling appointment in 2010, plaintiff had never received any mental health treatment. Tr. 247. Although plaintiff reported that she was independent in her activities of daily living, she nonetheless experienced "symptoms such as dysphoric mood, crying spells, and irritability," as well as "excessive worry while in public" and "difficulties with interacting socially." Tr. 248, 250. Dr. Keiter observed that plaintiff's "manner of relating, social skills, and overall presentation was poor due to her poor grooming and poor eye contact." Tr. 248. Nevertheless, plaintiff performed relatively well on objective testing, with intact language skills, thought processes, attention and concentration, memory, cognitive functioning, insight, and judgment. Tr. 248-49.

Accordingly, Dr. Keiter diagnosed plaintiff with major depressive and panic disorders, and listed "social phobia" as a rule out possibility. Tr. 250. She also recorded plaintiff's global assessment of functioning ("GAF") score as 68.[4] *Id.* In her "medical source statement," Dr. Keiter opined:

> Vocationally, [plaintiff] is able to understand and follow simple directions and instructions. She is able to perform simple and more complex tasks independently. She is able to maintain attention, concentration, and a regular schedule. She is able to learn new tasks. She is able to make appropriate decisions, but has difficulties relating adequately to others and may have difficulties at times appropriately dealing with stress.

*Id.*

---

[4] A GAF of 61 to 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." The American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 2000). While the fifth and most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders*, issued in 2013, "dropped the GAF scale," scores "issued in accordance with the then-applicable [fourth edition remain] relevant to the disability analysis." *Skelton v. Comm'r of Soc. Sec.*, 2014 WL 4162536, *11 (D.Or. Aug. 18, 2014) (citation and internal quotations omitted).

In evaluating step two, the ALJ accurately summarized Dr. Keiter's assessment, including the "GAF rating of 68, indicating only mild impairment in social, occupational or school functioning." Tr. 15. 17. The ALJ then considered the only other evidence of record relating to plaintiff's mental impairments – from the state agency consulting sources – which evinced that plaintiff's "medically determinable mental impairments of major depressive disorder [and] panic disorder . . . were non-severe and produced no restrictions of activities of daily living, mild difficulties in maintaining social functioning, and no difficulties in maintaining concentration, persistence or pace, and no episodes of decompensation." Tr. 15 (citing Tr. 252-64, 349). The ALJ further denoted that plaintiff had "not received consistent treatment for her mental health symptoms, and the record is devoid of any clinical assessments, findings, and/or diagnoses of any significant limitations imposed on [plaintiff] due to these condition[s]." Tr. 17. The ALJ concluded that plaintiff's depression and panic disorder did "not cause more than minimal limitation in [her] ability to perform basic mental work activities and are therefore nonsevere." *Id.*

The record before the Court corroborates the ALJ's determination regarding this issue. Indeed, plaintiff once again fails to furnish any argument or evidence demonstrating that her mental impairments significantly limited her ability to do basic work activities and an independent review of the record revealed none. *McLeod*, 640 F.3d at 888. Instead, plaintiff relies on her un-credible self-reports, Dr. Keiter's "observations regarding [h]er 'poor' social skills," and other treatment records, including those reflecting "that [she] appeared to have a depressed mood, had a flat affect, and appeared 'somewhat grumpy.'" Pl.'s Opening Br. 15-17; Pl.'s Reply Br. 5-6.

However, Dr. Keiter's observations of plaintiff's poor grooming and eye contact are not sufficient to establish the existence of a medically determinable, severe impairment at step two

Page 10 - OPINION & ORDER

or a work-related limitation of function that need be reflected in the RFC. SSR 96-8p, *available at* 1996 WL 374184; SSR 96–4p, *available at* 1996 WL 374187. Likewise, the fact that other providers noted plaintiff's depressed mood, flat affect, or grumpy attitude is inadequate to demonstrate the existence or extent of a specific impairment. *See Meanel v. Apfel*, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ properly disregarded a medical report that failed to explain the extent or significance of a condition). Furthermore, that plaintiff sought regular treatment, predominately for medication management, from certain general practitioners that were not providing specialized mental health treatment throughout the relevant time period does not support her position; this evidence merely reflects that she had no problem obtaining services when she wanted or believed she needed them. *See, e.g.*, Tr. 359-411.[5] While plaintiff proffers a more favorable reading of the record, because the ALJ's interpretation was nonetheless reasonable, it must be upheld. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004). The ALJ's step two finding is affirmed.

---

[5] Alternatively, plaintiff argues that the ALJ should have developed the record further in regard to her mental functioning due to Dr. Keiter's report and the alleged worsening of her conditions. Pl.'s Opening Br. 18; Pl.'s Reply Br. 24-25. The claimant bears the burden of proving the existence or extent of an impairment, such that the ALJ's limited "duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari,* 276 F.3d 453, 459–60 (9th Cir. 2001) (citation omitted). While neither the ALJ nor any medical source found the record to be ambiguous or inadequate for evaluation, Dr. Keiter did recommend that plaintiff obtain a "psychiatric evaluation" and "individual psychological therapy" to "address her symptoms of panic and depressed mood." Tr. 251. Regardless, in the more than two year period between the Dr. Keiter's assessment and the ALJ hearing, plaintiff did not seek any mental health treatment or look into no-cost or low-cost counseling options, despite obtaining other medical services. Tr. 47, 359-411. Further, plaintiff's un-credible subjective symptom statements are the only evidence supporting a worsening of psychological functioning; the medical record, which extends through 2013, does not reflect any change in mental health. Tr. 359-411. Finally, despite the fact that Dr. White identified psychological care as necessary component of fibromyalgia treatment, there is no indication that plaintiff sought mental health services after the ALJ hearing. Tr. 1-5, 39-40. Under these circumstances, the ALJ's duty to more fully develop the record was not triggered.

II.     Medical Opinion Evidence

Plaintiff also asserts that the ALJ failed to include all of the limitations assessed by Drs. Keiter and White, despite affording significant weight to those opinions. The ALJ is responsible for resolving ambiguities in the records and translating the claimant's impairments into concrete functional limitations. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008); *see also Davis v. Astrue*, 2012 WL 4005553, \*9 (D.Or. June 12), *adopted by* 2012 WL 3614310 (D.Or. Aug. 21, 2012) ("it is the responsibility of the ALJ, not the claimant's physician, to determine [the RFC] and the ALJ's findings of RFC need not correspond precisely to any physician's findings") (citations and internal quotations omitted). The distinction between an ALJ's rejection of a medical opinion and interpretation of an opinion is "procedurally significant" because of the different standards of review. *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995) (citations omitted).

A.      Dr. Keiter

As discussed above, Dr. Keiter examined plaintiff in February 2011. The ALJ gave "significant weight" Dr. Keiter's opinion because it was "well-supported by acceptable clinical diagnostic techniques" and "consistent with [plaintiff's] benign mental status exams as noted in the treatment records [and] the assessments of the State agency psychological medical consultants." Tr. 24. Although the ALJ considered plaintiff's alleged mental health impairments in devising the corresponding RFC, he did not include any non-exertional limitations related thereto. Tr. 19-22.

Thus, the ALJ did not implicitly reject certain facets of Dr. Keiter's opinion, but rather reasonably resolved that plaintiff's medically determinable mental impairments did not result in any work-related restrictions in light of the mild findings and record as whole. For instance, while plaintiff expressed social anxiety to Dr. Keiter, she also remarked that she lived with a

Page 12 - OPINION & ORDER

friend and "got along 'okay' with her mother by phone only." Tr. 249-50. Additionally, although there is little evidence relating to plaintiff's daily activities, the record nonetheless reflects that she maintained friendships, romantic relationships, and familial relationships during the relevant time period. *See, e.g.*, Tr. 44, 143, 283, 291, 366; *see also* Tr. 47-60 (testifying at the hearing that she socializes in person with her mother on a regular basis, went fishing with her family over the summer, and lives with her "sister [or] friends," who "take [her] a lot of times when [she] need to go someplace like grocery shopping [because it's hard for her] to hold the steering wheel . . . for a long period of time"). Moreover, her mental status exams were all normal and she was frequently described as "conversational" or "cooperative" by her medical providers. *See, e.g.*, Tr. 248-49, 367, 372, 386, 401, 404, 407.

To the extent plaintiff maintains that the portions of Dr. Keiter's narrative report specifying she "'has difficulties relating adequately to others and may have difficulties at times appropriately dealing with stress'" warrant a different conclusion, her argument is unpersuasive. Pl.'s Opening Br. 13 (quoting Tr. 250). Because it was phrased equivocally, the ALJ was not required to account for Dr. Keiter's statement regarding workplace stress. *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008); *see also Glosenger v. Comm'r of Soc. Sec. Admin.*, 2014 WL 1513995, *6 (D.Or. Apr. 16, 2014) (affirming the ALJ's rejection of functional restrictions assessed by a doctor who used "equivocal language ('might do better' and 'would also likely require')"). Dr. Keiter's remaining comment does not evince any specific functional impairment, especially in light of the fact that it included a vague qualifier – i.e. "difficulties *adequately* relating to others." Tr. 250 (emphasis added); *see also Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 601 (9th Cir. 1999) (ALJ can disregard a medical report that does "not show how [a claimant's] symptoms translate into specific functional deficits which preclude work activity"). Therefore, nothing in the record, including Dr. Keiter's

assessment, suggests that plaintiff is unable to perform work consistent with the RFC. The ALJ's evaluation of Dr. Keiter's opinion is upheld.

      B.    <u>Dr. White</u>

      During the March 2013 hearing, the ALJ asked Dr. White to summarize plaintiff's diagnoses and formulate a RFC. Tr. 35-36. Dr. White first explained that plaintiff reported a number of symptoms that could not be corroborated objectively: "[she] has multiple systems that are out of proportion to the actual physical findings as well as the imaging studies that she had done." Tr. 35; *see also* Tr. 36 ("[her] symptoms are more severe than the actual objective findings"). He then listed her diagnoses as fibromyalgia, leg pain, asthma, tendinitis, cholesterol, and collapsed arches. Tr. 35. Dr. White disagreed with the state agency consulting source's RFC and instead opined that plaintiff could perform light work with no: climbing of ladders, ropes, or scaffolds; or concentrated exposure to pulmonary irritants, humidity, wetness, extreme cold and heat, or vibration. Tr. 36-37. He also opined that plaintiff should be limited to moderate noise and occasional exposure to uneven surfaces. Tr. 37-38. In sum, he stated that "[t]here is no physical defect enough that would prevent [plaintiff] from being employed . . . [s]he should be able to do light work." Tr. 39.

      When cross-examined by plaintiff's attorney, Dr. White clarified that, although plaintiff's bilateral ulnar mononeuropathies were non-severe, that condition would be "significantly" exacerbated by full-time work involving "extensive use of her hands or elbows or arms." Tr. 38-39. Plaintiff's attorney also posed a number of questions concerning stress, absences, and the need for additional breaks or an understanding supervisor. Tr. 40-42. Dr. White stated that additional breaks or absences "may" be necessary, but he refused to quantify a specific number because "circumstances vary"; he also declined to quantify the amount of tolerable stress or type of supervisor in any given job but stated that "[p]atient[s] with fibromyalgia syndrome are

Page 14 - OPINION & ORDER

certainly more fragile than others." *Id.* In response to a question from plaintiff's attorney regarding a patient with mental impairments in conjunction with fibromyalgia, Dr. White remarked that "[n]obody dies from fibromyalgia ever [and] many patients get over it [if] they are helped out psychologically." Tr. 39-40. At that point, the ALJ interjected because the cross-examination was "getting into a lot of speculation" and referred Dr. White back to "the objective evidence of record"; plaintiff's counsel then stated he had "no further questions for the doctor." Tr. 42.

The ALJ gave "great weight" to the opinion of Dr. White because it was "based upon his review of the medical evidence in its entirety" and "well supported by his specific references to benign physical examination findings, inconsistent objective test results, and [plaintiff's] numerous subjective inconsistencies and significant activities of daily living." Tr. 23. In addition, the ALJ noted that Dr. White's opinion was "consistent with the treatments records . . . and the results of [plaintiff's] various x-ray and MRI scans." *Id.* As denoted above, the ALJ adopted Dr. White's diagnoses as part of his step two finding and included all of the concrete functional restrictions delineated by Dr. White in the RFC. Tr. 14, 19.

While she does not challenge any aspect of Dr. White's direct testimony, plaintiff nonetheless argues that the ALJ committed harmful legal error because he did not mention the doctor's comments on cross-examination "nor did he address any of these comments in the [RFC]." Pl.'s Opening Br. 14; Pl.'s Reply Br. 4-5. However, as discussed herein, the RFC "is not the least an individual can do despite his or her limitations or restrictions, but the most." SSR 96-8p, *available at* 1996 WL 374184; 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). Thus, it does not describe the claimant's optimal work environment. As a result, an ALJ need not include limitations in the RFC that are merely recommendations for success on the job, as opposed to imperatives.

Page 15 - OPINION & ORDER

Here, using the objective evidence of record, Dr. White assessed restrictions that would be medically necessary for plaintiff in a work environment and the ALJ adopted those restrictions. Tr. 19, 36-38. While Dr. White was both reasonable and compassionate in his cross-examination responses – proffering an opinion about the best way to treat patients with fibromyalgia – his testimony went beyond that of a ME for the purposes of evaluating disability. Tr. 39-42. In other words, because the questions posed by plaintiff's counsel strayed from a discussion of the actual evidence of record, the ALJ did not err in relying exclusively on Dr. White's specific statements regarding plaintiff's vocational limitations in formulating the RFC, as those statements expressly reflected his opinion of plaintiff's maximum functional capacities. The ALJ's assessment of the medical opinion evidence is affirmed.

III.    Step Five Finding

Lastly, plaintiff argues that the ALJ erred by applying the Grids at step five to determine that she was not disabled because she has significant non-exertional limitations. There are two ways that the Commissioner can meet his step five burden: by applying the Grids or taking the testimony of a vocational expert ("VE"). *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988). The Grids consist of a matrix of combinations relating to four vocational factors: age, work experience, education, and physical ability. *Tackett*, 180 F.3d at 1101. The Grids may be applied in the presence of non-exertional limitations – i.e. those "that do not directly affect a claimant's strength." *Burkhart*, 856 F.2d at 1340 (citation omitted). Conversely, the Grids are inapplicable "[w]hen a claimant's non-exertional limitations are sufficiently severe so as to significantly limit the range of work permitted by the claimant's exertional limitations." *Id.* (citation and internal quotations omitted). In such circumstances, the Commissioner must take the testimony of a VE and identify specific representative occupations that the claimant can perform despite her impairments. *Id.*

Page 16 - OPINION & ORDER

In this case, the ALJ outlined the correct step five legal standard and applied the Grids to find plaintiff not disabled despite her non-exertional limitations. Tr. 25. Specifically, the ALJ found that plaintiff's "additional limitations have little or no effect on the occupation base of unskilled work." *Id.* The ALJ also determined that given plaintiff's "age, education, and work experience," the same "types of exertional and non-exertional limitations, present in the case at hand, would not significantly erode the job base at the light job level." *Id.* (citations omitted).

Plaintiff concludes that she has "significant nonexertional limitations" but does not point to any particular RFC restriction that would preclude the ALJ from relying on the Grids as a framework. *See* Pl.'s Opening Br. 19 (merely reciting the ALJ's RFC assessment).[6] This is likely because limiting an individual to occasional postural activities does not significantly erode the occupational base; light exertion jobs may sometimes call for workers to stoop or crawl, but most do not require workers to perform these kinds of activities for more than one-third of an eight-hour workday. 20 C.F.R. §§ 404.1567(b), 416.967(b);[7] *see also* SSR 83-12, *available at* 1983 WL 31253 ("[a]n exertional capacity that is only slightly reduced in terms of regulatory criteria could indicate a sufficient remaining occupational base to satisfy the minimal requirements for a finding of 'Not disabled'"). Similarly, the elimination of ladders, ropes, and scaffolds, or a restriction to walking for no more than one-third of the workday on uneven surfaces, would not

---

[6] In her reply brief, plaintiff clarifies that she was referring to "the poor social skills and difficulty relating to others that Dr. Keiter assessed," as well as "the limitations identified by Dr. White." Pl.'s Reply Br. 10-11. However, as addressed in sections I and II, the ALJ did not err in regard to the reports of Drs. Keiter and White or, by extension, in contriving the RFC. As such, plaintiff's step five argument, which is contingent upon a finding of harmful error in regard to the aforementioned issues, is without merit. *Stubbs-Danielson*, 539 F.3d at 1175-76.

[7] Light exertion work involves "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. §§ 404.1567(b), 416.967(b).

eliminate most light exertion jobs; these non-exertional limitations may eliminate jobs where workers spend the day working outside, such as in the construction industry, but they are simply not the type of concerns that are present in the majority of light exertion positions. The same is true for a restriction on exposure to concentrated pulmonary irritants or excessive noise. In sum, there is no indication that the non-exertional limitations assessed in the case at bar are severe enough to significantly limit the range of light work permitted by plaintiff's exertional limitations. *See Hoopai v. Astrue*, 499 F.3d 1071, 1075-77 (9th Cir. 2007) (mental limitations found to be severe at step two were insufficient to erode the occupational base at step five so as to render the Grids inapplicable). The ALJ's step five finding is upheld.

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this _15_ day of October, 2015.

Mark D. Clarke
United States Magistrate Judge

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

RENEE L. GOIN-SPRAGUE,

                    Plaintiff,

    v.

CAROLYN W. COLVIN,
Commissioner, Social Security
Administration,

                Defendant.

Case No. 6:14-cv-00897-CL

JUDGMENT

Based on the record, IT IS ORDERED AND ADJUDGED that the decision of the

Commissioner is AFFIRMED and this case is DISMISSED.

IT IS SO ORDERED.

DATED this _____ day of October, 2015.

                                   Mark D. Clarke
                     United States Magistrate Judge

Page 1 – JUDGMENT